UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TYRONE JAMES DAVIS,

                          Plaintiff,

        v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

_____

                                            <u>DECISION & ORDER</u>

                                            15-CV-6695P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Tyrone James Davis ("Davis") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Supplemental Security Income and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 7).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 11, 13).  For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards.  Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Davis's motion for judgment on the pleadings is denied.

**BACKGROUND**

**I.      Procedural Background**

Davis protectively filed for SSI/DIB on September 27, 2012, alleging disability

beginning on July 16, 2010, due to scoliosis, chronic lower back pain, post-spinal fusion with

rods, limited ability to stand or sit in excess of one hour, limited ability to engage in prolonged

walking, and limited ability to bend and lift objects.  (Tr. 136, 140).[1]  On December 13, 2012, the

Social Security Administration denied Davis's claim for benefits, finding that he was not

disabled.[2]  (Tr. 72-79).  Davis requested and was granted a hearing before Administrative Law

Judge Michael W. Devlin (the "ALJ").  (Tr. 80-81, 92-96).  The ALJ conducted the hearing on

July 8, 2014.  (Tr. 30-51).  Davis was represented at the hearing by his attorney, Justin Goldstein,

Esq.  (Tr. 30, 70).  In a decision dated August 15, 2014, the ALJ found that Davis was not

disabled and was not entitled to benefits.  (Tr. 17-25).

On September 24, 2015, the Appeals Council denied Davis's request for review of

the ALJ's decision.  (Tr. 1-4).  Davis commenced this action on November 13, 2015, seeking

review of the Commissioner's decision.  (Docket # 1).

**II.      Relevant Evidence[3]**

**A.      Medical Records**

**1.      Florida Hospital Fish Memorial Emergency Department**

On June 11, 2011, Davis presented to the emergency department at the Florida

Hospital Fish Memorial complaining of chronic low back pain.  (Tr. 184-86).  He reported that

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Davis had previously applied for and been denied benefits in a decision dated June 3, 2011.  (Tr. 136-37).

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.

his pain was a level seven of ten and was exacerbated with movement. (*Id.*). Davis was prescribed Vicoprofen and assessed to have suffered a back sprain or strain. (*Id.*). He was advised to follow up with Florida Orthopedics in one week. (*Id.*).

Davis returned to the emergency department on July 13, 2011, complaining of lower back pain. (Tr. 187-90). According to Davis, he had suffered from chronic lower back pain and was scheduled to begin physical therapy the following day. (*Id.*). He reported pain at a level ten of ten that was exacerbated by movement, bending over, standing, and walking. (*Id.*). Upon examination, Davis exhibited normal range of motion and alignment, with moderate tenderness in the mid-lumbar region. (*Id.*). The straight leg raise test was negative. (*Id.*). Davis was discharged with prescriptions for a Salonpas pain patch with capsaicin, a Prednisone dose pack, Motrin, and Flexeril. (*Id.*). He was advised to follow up with his primary care provider. (*Id.*).

### 2.  **Florida Hospital Fish Memorial Outpatient Rehabilitative**

On June 29, 2011, Davis began treatment at the Florida Hospital Fish Memorial Outpatient Rehabilitative Services Department. (Tr. 191-92, 197-98). On that date, Davis was evaluated for exacerbation of his lower back pain. (*Id.*). He reported decreased tolerance for prolonged sitting and standing. (*Id.*). He was assessed to require treatment for significant soft tissue restrictions, flexibility issues, mild hip weakness, decreased core strength and lumbar stability, and decreased lumbar and ankle range of motion. (*Id.*). Davis attended physical therapy appointments during July and August 2011. (Tr. 196-204). During that time, Davis had fair attendance and made slower than expected progress. (*Id.*).

### 3.     Strong Memorial Hospital Emergency Department

On June 25, 2012, Davis presented at the emergency department of Strong Memorial Hospital complaining of chronic back pain.  (Tr. 254-61).  He reported a history of scoliosis surgery and worsening back pain.  (*Id.*).  He indicated that he had recently moved to the area and did not yet have a primary care physician.  (*Id.*).  Upon examination, Davis exhibited spasm in his lumbar back without bony tenderness.  (*Id.*).  He was diagnosed with chronic back pain and discharged home with prescriptions for Flexeril and Tramadol.  (*Id.*).  He was also provided contact information for primary care physicians and a spine doctor.  (*Id.*).

### 4.     Cornhill Internal Medicine

Treatment records indicate that Davis met with Rajendra Singh ("Singh") at Cornhill Internal Medicine on November 14, 2012, to establish primary care.  (Tr. 208-09).  During the visit, Davis reported a long history of chronic back pain and that he had undergone a spinal fusion at the age of 12.  (*Id.*).  Davis reported that he had rods and plates in his back that had never been removed due to lack of insurance.  (*Id.*).  He also reported increased pain since 2007, but that he had not sought treatment because he lacked insurance.  (*Id.*).  According to Davis, he had dropped out of school for business management due to back pain and had recently moved to Rochester and had obtained insurance.  (*Id.*).

Upon examination, Singh noted tenderness of the lumbosacral spine with no restrictions on movement.  (*Id.*).  The straight leg raise test was negative on the right side and positive at thirty degrees on the left side.  (*Id.*).  Davis exhibited five out of five power in his lower extremities, the ability to walk on his heels and toes, and normal reflexes.  (*Id.*).  Singh assessed chronic back pain.  (*Id.*).  Singh ordered an x-ray of his lumbar spine and referred him

to physical therapy and an orthopedic surgeon.  (*Id.*).  He prescribed Proximal, Amitriptyline, and Tramadol.  (*Id.*).

On December 20, 2012, images were taken of Davis's spine.  (Tr. 268-69).  The images revealed no evidence of hardware fracture.  (*Id.*).  On February 5, 2013, Davis returned for a follow-up appointment with Singh.  (Tr. 270-72).  Treatment notes suggest that since the last appointment, Davis had undergone a CT scan of his spine and had met with Dr. Paul Rubery, a spine specialist who had recommended conservative treatment without surgical intervention. (*Id.*).  Davis had been referred for physical therapy and was prescribed Amitriptyline, Naproxen, and Tramadol.  (*Id.*).  Despite the medications, Davis reported that he continued to experience pain in his upper and mid back.  (*Id.*).  Upon examination, Singh noted lumbar kyphosis, but no tenderness to palpation.  (*Id.*).  Davis's forward flexion and lateral bending movements were somewhat painful and restricted.  (*Id.*).  The straight leg raise test was negative bilaterally.  (*Id.*). Davis was able to walk on his heels and toes and demonstrated full strength and reflexes in his lower extremities.  (*Id.*).  Singh advised Davis to continue with the medications and physical therapy recommended by Dr. Rubery and to return for a follow-up appointment in three months. (*Id.*).

### 5.      Rochester General Hospital

On December 27, 2012, Davis presented to the emergency department at Rochester General Hospital complaining of back pain after shoveling snow earlier that afternoon. (Tr. 241-47).  Davis reported that he had taken Tramadol, Naproxen, and Amitriptyline without relief.  (*Id.*).  According to Davis, his pain was moderate and did not radiate, although it interfered with his sleep.  (*Id.*).  Upon examination, Davis exhibited normal range of motion in his thoracic and lumbar back, with bilateral lower thoracic paraspinal tenderness.  (*Id.*).  Davis

was discharged with Valium and Norco and advised to follow up with his primary care physician or back specialist.  (*Id.*).

### 6.   Paul Rubery, MD

Davis attended a consultative appointment with Paul Rubery ("Rubery"), MD, on January 7, 2013.  (Tr. 249-50).  Davis reported ongoing lower back pain and that he had undergone an anterior posterior fusion at T10-L4 as a teenager to address his congenital kyphosis.  (*Id.*).  Treatment notes suggest that Davis was a trained sports journalist, but was not currently working.  (*Id.*).  Upon examination, Rubery noted no discomfort, normal gait, normal toe walk, normal heel walk, normal tandem gait, normal Romberg test, normal straight leg raise, and no midline stigmata.  (*Id.*).  Rubery did note a slight anterior lean in Davis's sagittal balance and pain when Davis flexed to bring his hands to his knees.  (*Id.*).  Rubery assessed back pain after an extensive fusion for congenital kyphosis.  (*Id.*).  He ordered a CT scan to assess fusion healing and referred Davis for physical therapy.  (*Id.*).  The imaging was conducted on January 28, 2013.  (Tr. 251-52, 265-67).  The imaging showed status post left lateral and bilateral posterior spinal fusion at T10 through L4 with no evidence of hardware complication.  (*Id.*).

On February 11, 2013, Davis returned for an appointment with Rubery.  (Tr. 278). During the appointment, Rubery reported that the CT scan revealed a solid fusion without any clear evidence of pseudarthrosis.  (*Id.*).  He did note that there was mild wear and tear in one disc.  (*Id.*).  Rubery opined that Davis's ongoing pain might be due to a lumbar kyphosis and that physical therapy was the best approach to maintaining back strength.  (*Id.*).  Rubery advised against further surgery, believing it was unlikely to provide predictable relief.  (*Id.*).  Davis was frustrated by the inexact nature of the diagnosis and the advisement against surgery.  (*Id.*).

Davis returned to Rubery's office on August 6, 2013, and met with Deborah Horst ("Horst"), NP.  (Tr. 290).  Davis reported that he continued attending physical therapy and had completed his second course without relief.  (*Id.*).  Davis expressed frustration and indicated that he would like something more done because he had not experienced any significant response after two courses of physical therapy.  (*Id.*).  Horst ordered an MRI and advised Davis to return for a follow-up appointment with Rubery.  (*Id.*).  The MRI was conducted on August 13, 2013.  (Tr. 291-92).  The metal rods in Davis's back obstructed visualization of the lumbar spine.  (*Id.*).

### 7.    University Sports and Spine Rehabilitation

Davis attended two physical therapy appointments at University Sports and Spine Rehabilitation in January 2013.  (Tr. 274-77).  During each visit, Davis rated his pain at a level four and reported improvement with home exercise.  (*Id.*).  With therapy, Davis was able to improve his range of motion, strength, and functioning.  (*Id.*).

On May 30, 2013, Jillian Collins ("Collins") conducted a lumbar spine evaluation. (Tr. 279-83).  She noted that Davis suffered from a fixed kyphosis and that he had previously undergone rehabilitation in January 2013.  (*Id.*).  According to the treatment notes, Davis's doctors had recommended conservative treatment with medication and physical therapy.  (*Id.*). Davis reported that his last physical therapy session had improved his flexibility, although he continued to experience pain.  (*Id.*).

Davis reported that he was not working due to back pain, but that he completed housekeeping chores, worked out using free weights, and walked approximately 2.5 miles twice a week.  (*Id.*).  He indicated that his pain worsened with bending, sitting, or prolonged standing and was alleviated by lying down or performing bridging exercises.  (*Id.*).  Upon examination,

Collins noted significant tightness in Davis's hamstrings, but a straight leg raise test was negative bilaterally. (*Id.*). She assessed that his prognosis was fair. (*Id.*).

Treatment notes suggest that Davis attended approximately six out of the twenty-three scheduled physical therapy appointments. (Tr. 284-89, 293). He was eventually discharged from treatment after failing to return for a follow-up appointment. (*Id.*).

### 8.   Clint Koenig, MD

On April 16, 2013, Davis met with Clint Koenig ("Koenig"), MD, to establish care. (Tr. 318-20). Davis reported ongoing back pain that had made it difficult for him to sit in class. (*Id.*). He reported constant pain that was alleviated by lying down and that he had attempted physical therapy without improvement. (*Id.*). Upon examination, Koenig noted full strength and a normal gait. (*Id.*). He referred Davis for physical therapy. (*Id.*).

Davis returned for an appointment with Koenig on July 2, 2013. (Tr. 321-22). During the appointment, Davis reported continued back pain that was aggravated by walking or standing. (*Id.*). He reported that he currently was not taking medication, although he had previously been prescribed Tramadol and Amitriptyline. (*Id.*). Koenig noted that Davis appeared to be in moderate pain, but had normal reflexes and range of motion, and the straight leg raise was negative bilaterally. (*Id.*). A Faber test revealed mild pain on the left. (*Id.*). Koenig prescribed Desipramine, Naproxen, and Tramadol and referred Davis to a neurosurgeon for evaluation. (*Id.*).

On August 26, 2013, Davis attended another appointment with Koenig. (Tr. 325-26). He reported that he was attending physical therapy and that Tramadol was not alleviating his pain. (*Id.*). Upon examination, Koenig noted mild tenderness to palpation along

the paraspinal areas of T11 to T12.  (*Id.*).  He assessed that Davis suffered from lower back pain

that continued to be "under control."  (*Id.*).

Davis met with William Schaefer ("Schaefer"), PA, on September 9, 2013, for an

urgent visit.  (Tr. 327-28).  Davis rated his current pain as a level nine of ten and reported that he

had stopped taking Ultram approximately three days earlier due to side effects.  (*Id.*).  He had

called the triage line that morning, reported that he intended to go to the hospital emergency

room, but agreed to an urgent appointment instead.  (*Id.*).  Schaefer noted that Davis was crying

when he entered the room and relayed suicidal thoughts with a plan.  (*Id.*).  Davis appeared to be

in moderate pain.  (*Id.*).  Schaefer assessed that Davis was suffering from depression related to

his chronic back pain and asked the mental health counselor to meet with Davis.  (*Id.*).

Emergency services were contacted, and Davis agreed to go to the University of Rochester

Medical Center for a psychiatric evaluation.  (*Id.*).

Davis was evaluated at Strong Memorial Hospital.  (Tr. 446-86).  He was

diagnosed with depressive disorder, not otherwise specified, and was discharged that same day.

(Tr. 458).  He was advised to follow up with mental health treatment and to contact a pain

treatment center for an appointment.  (*Id.*).

The following day, September 10, 2013, Davis returned to Koenig's office and

met with Michael Mancenido ("Mancenido"), DO.  (Tr. 329-30).  Davis reported that he was

experiencing "bad withdrawals" from Tramadol, which had provided some relief.  (*Id.*).  Davis

reported that he was unable to work due to back pain.  (*Id.*).  Upon examination, Mancenido

noted localized pain at the lower thoracic, upper lumbar area.  (*Id.*).  He prescribed Gabapentin,

referred Davis to a pain management clinic, and advised him to obtain a TENS unit during his

next physical therapy appointment.  (*Id.*).  He also encouraged Davis to attend a scheduled Rochester Mental Health appointment.  (*Id.*).

Davis met with Koenig on October 7, 2013.  (Tr. 331-32).  Davis reported that the medication prescribed by Mancenido had not alleviated his pain and he had stopped taking it. (*Id.*).  Davis was missing physical therapy appointments, and although he experienced some relief during the appointments, the relief subsequently dissipated.  (*Id.*).  He reported that he felt better when he was less active and that he had been attending church.  (*Id.*).  Davis requested a referral for pain management.  (*Id.*).  Koenig referred Davis to a pain specialist and a neurosurgeon for evaluation.  (*Id.*).  He also referred him to physical therapy to be evaluated for use of a TENS unit.  (*Id.*).  He also prescribed Kadian and Effexor.  (*Id.*).

On November 4, 2013, Davis returned for an appointment with Koenig. (Tr. 333-34).  He reported that the Kadian had decreased his pain from a level six to a level three or four.  (*Id.*).  Davis had not filled his prescription for Effexor.  (*Id.*).  He reported that he regularly attended church and had begun using marijuana for stress and sleep.  (*Id.*).  Koenig referred Davis to Huther Doyle for substance abuse evaluation and a pain contract before he would agree to continue to prescribe pain medication.  (*Id.*).  He also advised Davis to attend an appointment with Heather White ("White"), RN, for a pain assessment.  (*Id.*).  Later that same day, Davis met with White for the pain assessment.  (Tr. 335-36).  White recommended that Davis attend the substance abuse evaluation and then return for further treatment.  (*Id.*).

Davis returned for an appointment with Koenig on January 8, 2014, for a physical assessment.  (Tr. 339-40).  Davis requested that Koenig complete paperwork for the Department of Social Services ("DSS").  (*Id.*).  Davis reported that he had attended an appointment with a pain specialist and that his pain was currently a level four of ten, although it was aggravated by

10

long walks.  (*Id.*).  He reported that he currently was not taking any medication and had been stretching, working out, and walking at home.  (*Id.*).  Koenig completed the paperwork and advised Davis to return in four months.  (*Id.*).

On June 3, 2014, Davis attended another appointment with Koenig.  (Tr. 342-43). He reported that he had begun smoking again due to stress and was walking three to four times a week.  (*Id.*).  Davis reported ongoing back pain at a level six or seven of ten on most days and at a level nine of ten if he walked too much.  (*Id.*).  He reported that he had used a TENS unit at physical therapy, which had helped.  (*Id.*).  Davis asked Koenig to write a letter stating that he was disabled.  (*Id.*).  Upon examination, Koenig observed normal gait and range of motion. (*Id.*).  He referred Davis to a neurosurgeon and for additional physical therapy.  (*Id.*).

### 9.      Pain Treatment Center at Sawgrass

On November 18, 2013, Davis attended an appointment with Matthew Perkowski ("Perkowski"), DO, at the Pain Treatment Center at Sawgrass.  (Tr. 490-510).  Perkowski assessed that Davis's pain symptoms and physical examination were consistent with nociceptive and neuropathic pain, secondary to his previous fusion surgery.  (Tr. 496).  Perkowski opined that Davis was not a candidate for a spinal cord stimulator trial and noted that any changes to Davis's medication regime should be closely monitored.  (*Id.*).  Perkowski recommended a trial of Lidoderm ointment.  (*Id.*).

### B.      Medical Opinion Evidence

### 1.      Harbinder Toor, MD

On July 16, 2012, Harbinder Toor ("Toor"), MD, conducted a consultative examination of Davis and completed a physical assessment for determination of employability form for DSS.  (Tr. 231-34).  According to Toor, Davis reported suffering from chronic, dull,

achy back pain that sometimes reached a level nine of ten.  (*Id.*).  Davis reported that the pain

began in the middle of his back and radiated to the upper and lower back, causing difficulty

standing, walking, sitting, bending, and lifting.  (*Id.*).

Upon examination, Davis presented with "excruciating" pain in his back.  (*Id.*).

He had a normal gait and was able to complete the heel and toe walk.  (*Id.*).  He was able to

squat twenty percent of full.  (*Id.*).  Davis declined to attempt forward flexion, extension, lateral

flexion, or lateral rotation of his spine.  (*Id.*).  He also declined to perform the straight leg raise

test.  (*Id.*).

Toor opined that Davis was able to walk and stand approximately one to two

hours and could sit for approximately two to four hours.  (*Id.*).  Toor also opined that Davis was

able to push, pull, bend, and climb stairs approximately one to two hours and could occasionally

lift ten pounds.  (*Id.*).  Toor indicated that Davis was unable to participate in any activities except

treatment or rehabilitation for the next three months due to his back pain and recommended that

he be evaluated by an orthopedic surgeon.  (*Id.*).  Toor did not believe that Davis's impairment

would prevent him from working for more than six months.  (*Id.*).

## 2.   Samuel Balderman, MD

On November 30, 2012, state examiner Samuel Balderman ("Balderman"), MD,

conducted a consultative internal medicine examination of Davis.  (Tr. 222-24).  Davis reported

suffering from lumbar spine pain that was constant and moderate in intensity.  (*Id.*).  He reported

that the pain was aching, but not radiating, and that medications were not effective in alleviating

the pain.  (*Id.*).  Davis reported finishing high school and that he had been employed two years

earlier as a health care aide.  (*Id.*).  Davis reported that he was able to care for his personal

hygiene and enjoyed watching television, listening to the radio, and reading.  (*Id.*).

Upon examination, Balderman noted that Davis did not appear to be in acute distress and had a normal gait. (*Id.*). Davis was able to walk on his heels and toes and could perform a full squat. (*Id.*). Davis needed no assistive devices or help changing or getting on or off the table. (*Id.*). He was also able to rise to a seated position without difficulty. (*Id.*).

Balderman noted that Davis's cervical spine showed full flexion, extension, and lateral flexion bilaterally and full rotary movements bilaterally. (*Id.*). Balderman found that Davis's lumbar flexion was limited to eighty degrees with full extension. (*Id.*). Balderman noted no tenderness or trigger points and that the straight leg raise test was negative bilaterally. (*Id.*). Balderman found full range of motion in Davis's shoulders, elbows, forearms, wrists, fingers, hips, knees, and ankles bilaterally. (*Id.*). Balderman opined that Davis's prognosis was stable and that he would have mild to moderate limitations in repetitive bending and lifting due to a congenital thoracic and lumbar spine abnormality. (*Id.*).

### 3.      Jennifer Paul, MD

On December 11, 2012, Jennifer Paul ("Paul"), MD, conducted a consultative examination of Davis and completed a physical assessment for determination of employability form for the Department of Human Services ("DHS"). (Tr. 236-39). According to Paul, Davis reported suffering from constant back pain that sometimes reached a level eight of ten. (*Id.*). Davis reported that the pain was worse with activity. (*Id.*).

Upon examination, Davis presented with a normal appearance and gait. (*Id.*). He exhibited lumbar pain with range of motion and paraspinal pain. (*Id.*). Paul opined that Davis was capable of walking two to four hours and could sit for more than four hours during an eight-hour workday. (*Id.*). She also opined that Davis was capable of pushing, pulling, bending, lifting, and carrying for one to two hours during an eight-hour workday. (*Id.*). She opined that

he was able to work up to forty hours per week so long as his position required limited repetitive heavy lifting, bending, and twisting.  (*Id.*).

### 4.    Koenig's Opinion

On January 8, 2014, Koenig completed a physical assessment for determination of employability form for DHS.  (Tr. 311-14).  According to Koenig, Davis suffered from back pain relating to a surgery conducted in 1996 to address his congenital scoliosis.  (*Id.*).

Upon examination, Davis presented with a normal appearance and gait.  (*Id.*).  He was able to complete heel and toe walking and could squat normally.  (*Id.*).  Koenig opined that Davis was capable of walking and standing up to one to two hours and could sit for more than four hours during an eight-hour workday.  (*Id.*).  He also opined that Davis was capable of pushing, pulling, bending, lifting, and carrying for one to two hours during an eight-hour workday.  (*Id.*).  He opined that Davis was able to work as long as he was not required to engage in prolonged standing of more than one hour.  (*Id.*).

## III.    Non-Medical Evidence

In his application for benefits, Davis reported that he had been born in 1984. (Tr. 121).  Davis reported that he had completed high school in a regular classroom setting. (Tr. 141).  According to Davis, he had previously been employed in customer service and as a dietary aide.  (Tr. 142).  At the time of his application, Davis had been unemployed since July 16, 2010.  (Tr. 141).

Davis reported that he lived alone in an apartment and spent his days sleeping, playing video games, watching television, and attending appointments.  (Tr. 147-48).  Davis reported that his back pain disturbed his sleep.  (*Id.*).  Davis indicated that he was able to care for

his own personal hygiene without assistance and could prepare simple meals.  (Tr. 148, 150).

According to Davis, he was able to do laundry, vacuum, wash dishes, dust, and any other

household chores which did not require him to perform heavy lifting or to sit or stand for more

than twenty minutes.  (Tr. 149).  Davis was unable to perform outdoor chores and left his

residence approximately every other day.  (*Id.*).  He went grocery shopping once every two

weeks for approximately thirty minutes.  (Tr. 151).  Davis's driver's license had been suspended

due to traffic infractions, but he was able to use public transportation.  (*Id.*).

According to Davis, he used to enjoy playing with his daughter, playing sports,

traveling, and going on road trips, but was no longer able to engage in these activities due to

pain.  (*Id.*).  Davis reported that he was unable to lift more than twenty to thirty pounds and could

stand for only approximately fifteen minutes at a time.  (Tr. 152).  According to Davis, he could

walk only approximately half a mile at a time and could not climb more than three flights of

stairs at a time.  (Tr. 152-53).  He reported that sitting helped to alleviate some of his pain, but

lying down was more effective.  (*Id.*).  He could kneel for short periods of time, but had

difficulty squatting.  (*Id.*).  He reported no difficulty using his hands or reaching.  (*Id.*).  Davis

reported that he had difficulty completing tasks due to pain and limited flexibility.  (*Id.*).

According to Davis, he had begun to experience pain in 2006, and it had grown

worse each year.  (Tr. 155).  Davis described the pain as a "strong aching feeling" in the middle

of his spine that was consistent throughout the day and night.  (Tr. 155-56).  Davis reported that

his pain was exacerbated by activities involving movement, lifting, or flexibility.  (Tr. 156).

Davis took medication to address his pain, which alleviated the pain for a few hours, but caused

drowsiness.  (Tr. 156-57).  According to Davis, stretching and lying with a pillow between his

legs helped to alleviate the pain.  (Tr. 157).

During the administrative hearing, Davis testified that he was twenty-nine years old, lived alone in an apartment, and obtained financial assistance from DSS.  (Tr. 34). According to Davis, he was not required to work as a condition of receiving DSS assistance because he did not meet the physical requirements of the work program.  (Tr. 35).  Davis testified that he had completed high school and had begun attending college for business and marketing in 2006.  (Tr. 35-36).  According to Davis, his physical pain made it difficult to continue college and he stopped attending in order to focus on his health.  (Tr. 36).  Davis testified that his last employment was as a dietary aide at a retirement home in Florida.  (*Id.*).

Davis stated that he was unable to work due to physical limitations.  (Tr. 38). According to Davis, he could stand for only approximately twenty minutes at a time and could sit for only thirty minutes at a time due to back pain.  (*Id.*).  Davis testified that after sitting for approximately thirty minutes, he needed to stand up, walk around, and stretch.  (Tr. 38-39). Davis reported that lying with a pillow between his legs helped to alleviate his pain.  (*Id.*).

Davis testified that physical therapy increased his flexibility, but did not relieve his pain.  (*Id.*).  He also stretched and took walks in an attempt to alleviate his pain.  (*Id.*). According to Davis, he could walk only approximately two blocks before having to turn around due to pain.  (*Id.*).  Davis also took pain medication, which diminished his pain level from seven or eight to four or five.  (Tr. 40).  According to Davis, his doctors continued to try to find the right combination of medication to alleviate his pain, but many medications were not covered by his insurance.  (Tr. 41-42).

Davis testified that he generally felt "okay" when he woke up, but begun to experience pain with activity.  (Tr. 42).  According to Davis, he was able to perform limited housework, including washing dishes and vacuuming.  (*Id.*).  Davis indicated that he was unable

to scrub floors and, although he did grocery shop, it was a struggle to do so.  (Tr. 43).  Davis

generally used a medical taxi cab or the bus to get to appointments.  (*Id.*).  He was not involved

in many organizations, but was active in his church.  (*Id.*).

Davis reported that he was treating with a back specialist, Rubery, who had

advised him that surgery would be risky and that he was likely to suffer chronic pain for the rest

of his life and should consider seeking SSI.  (Tr. 44).  Rubery advised Davis to continue physical

therapy and to try different combinations of medications in an effort to identify a medication

regimen that would effectively control his pain.  (*Id.*).  Davis testified that he also treated with a

pain specialist, who had opined that he would not benefit from injections because his pain was

located too close to a central nerve area.  (Tr. 45).  Davis currently received primary care from

Koenig, who had referred him to various specialists and had prescribed the use of a TENS unit,

which had provided short-term relief.  (Tr. 45-46).

Vocational expert, Julie Andrews ("Andrews"), also testified during the hearing.

(Tr. 47-50).  First, the ALJ noted that Davis had no past work that was performed at a substantial

gainful activity level.  (Tr. 47).  The ALJ then asked Andrews whether a person would be able to

perform any jobs in the national economy who was the same age as Davis, with the same

education and vocational profile, and who was able to perform sedentary work, including the

ability to occasionally lift and/or carry ten pounds, frequently lift and/or carry less than ten

pounds, stand and/or walk for two hours in an eight-hour workday and sit for six hours in an

eight-hour workday, but could never stand for more than one hour at a time and could only

occasionally balance, stoop, kneel, crouch, crawl, push and/or pull ten pounds, and climb ramps

and/or stairs, and could never climb ladders, ropes and/or scaffolds.  (Tr. 47-48).  Andrews

testified that such an individual would be able to perform positions in the national economy,

including brake linings coder and label pinker.  (Tr. 48).  The ALJ then asked Andrews whether

jobs would exist for the same individual with the same limitations, except that the individual was

unable to sit, stand and walk in combination for at least eight hours in an eight-hour workday.

(*Id.*).  Andrews testified that such an individual would not be able to maintain employment on a

full-time, competitive basis.  (*Id.*).

Davis's attorney asked Andrews to assume the same limitations identified by the

ALJ in the first hypothetical, but to also add the limitation that the individual would need to walk

away from their work station for ten minutes every hour.  (Tr. 49).  Andrews testified that such

an individual would not be able to maintain employment on a full-time, competitive basis.  (*Id.*).


## DISCUSSION

## I.      Standard of Review

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

    (1)    whether the claimant is currently engaged in substantial gainful activity;

(2)     if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)     if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## II.     The ALJ's Decision

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims.  (Tr. 19-25).  Under step one of the process, the ALJ found that Davis had not engaged in substantial gainful activity since July 16, 2010, the alleged onset date.  (Tr. 19).  At step two, the ALJ concluded that Davis had the severe impairment of status post corrective surgery for congenital kyphoscoliosis.  (*Id.*).  The ALJ determined that there was insufficient medical evidence to demonstrate that Davis suffered from adjustment disorder with depressed mood and concluded that the condition resulted in no more than minimal functional limitations. (Tr. 19-20).  At step three, the ALJ determined that Davis did not have an impairment (or

combination of impairments) that met or medically equaled one of the listed impairments. (Tr. 20). The ALJ concluded that Davis had the Residual Functional Capacity ("RFC") to perform the full range of sedentary work, including occasionally lifting and carrying ten pounds, frequently lifting and carrying less than ten pounds, standing or walking at least two hours during an eight-hour workday and sitting for six hours during an eight-hour workday, but that Davis could never stand for more than an hour at a time and could only occasionally push and/or pull ten pounds. (Tr. 20-24). At steps four and five, the ALJ determined that Davis had no relevant prior work, but that based upon his age, education, work experience, and RFC, Davis was not disabled pursuant to application of the Medical Vocational Guidelines (the "Grid"), specifically, Grid Rule 202.17, 20 C.F.R. Part 404, Subpart P, Appendix 2. (Tr. 24-25). Accordingly, the ALJ found that Davis was not disabled. (*Id.*).

## III.   Analysis

Davis contends that the ALJ's RFC determination is not supported by substantial evidence and is the product of legal error. (Docket # 11-1). According to Davis, the ALJ improperly formulated an RFC using his own lay opinion because it was not supported by any medical opinion in the record. (*Id.* at 14-20). I disagree.

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)). In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009)

(citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant

evidence, including medical opinions and facts, physical and mental abilities, non-severe

impairments, and [p]laintiff's subjective evidence of symptoms."  *Stanton v. Astrue*, 2009 WL

1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d

Cir. 2010).

"[A]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical

findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment

is not supported by substantial evidence."  *Dailey v. Astrue*, 2010 WL 4703599, *11 (W.D.N.Y.)

(internal quotation omitted), *report and recommendation adopted*, 2010 WL 4703591 (W.D.N.Y.

2010).  Accordingly, although the RFC determination is an issue reserved for the Commissioner,

"[w]here the medical findings in the record merely diagnose [the] claimant's exertional

impairments and do not relate those diagnoses to specific residual functional capabilities," the

Commissioner generally "may not make the connection himself."  *Deskin v. Comm'r of Soc.

Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008) (internal quotation omitted).

Davis maintains that the ALJ formulated the RFC without the benefit of any

medical opinion of record and without making clear how he did so.  (Docket ## 11-1 at 14-21;

14 at 1-5).  According to Davis, the ALJ's conclusion that he was able to stand for an hour at a

time (but no longer) was not supported by any medical opinion of record.  (*Id.*).  A review of the

ALJ's decision, however, demonstrates that he relied upon the consulting opinions in

formulating the RFC; indeed, the RFC is consistent with those opinions and adequately accounts

for the limitations assessed by the consulting physicians.

In his decision, the ALJ thoroughly discussed the opinions of Toor, Balderman,

and Paul, and specifically noted that Balderman assessed limitations for repetitive bending and

lifting and that Toor and Paul both noted some limitations in Davis's ability to stand in excess of two or four hours during an eight-hour workday. (Tr. 23). The ALJ accounted for these limitations by limiting Davis to jobs that require standing or walking for two hours in an eight-hour workday, with no more than one hour of standing at a time, and only occasional lifting, carrying, pushing, and pulling of objects weighing ten pounds. (Tr. 21). *See Hamilton v. Astrue*, 2013 WL 5474210, *15 (W.D.N.Y. 2013) (opinion that plaintiff was "'very limited' in her ability to stand, walk, push, pull, bend and climb" was consistent with "sedentary work, which involves lifting no more than ten pounds and limited walking and standing") (citing 20 C.F.R. § 404.1567(a)).

According to Davis, because the one-hour standing limitation assessed by the ALJ does not precisely correspond to a medical opinion in the record, remand is warranted. (Docket ## 11-1, 14). Although the RFC must be supported by medical opinions, it is ultimately the ALJ's duty to formulate the RFC after evaluating the opinion evidence, treatment records, and the testimony of the claimant. *See O'Neil v. Colvin*, 2014 WL 5500662, *6 (W.D.N.Y. 2014) ("the ALJ's RFC finding need not track any one medical opinion") (citing *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("although ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, ALJ was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole")).

Davis's reliance upon *Cosnyka v. Colvin*, 576 F. App'x 43, 46 (2d Cir. 2014), to compel a contrary result is misplaced. (*See* Docket # 11-1 at 18-19). In *Cosnyka*, the ALJ credited an orthopedic examiner's opinion that the claimant would require "regular comfort breaks," which the ALJ translated into a limitation that the claimant would need a break for six minutes out of every hour. 576 F. App'x at 46. The Second Circuit determined that remand was

appropriate because nothing in the record, including the medical records or the claimant's testimony, supported the ALJ's conclusion and indeed some evidence was "to the contrary." *Id.* In this case, by contrast, the RFC formulated by the ALJ is supported by Davis's daily activities, conservative treatment, and the evaluations of Balderman, Toor, and Paul.

As noted by the ALJ, Davis was able to care for his personal hygiene, care for himself, cook light meals, use public transportation, handle his finances, shop, and participate in religious services and activities. (Tr. 24). Further, he noted that the medical records demonstrated essentially normal findings upon physical examination, other than some mild pain and tenderness. (Tr. 22). Davis's treating physicians prescribed conservative treatment, including physical therapy which Davis failed to complete, and recommended against surgery. (Tr. 270, 278-79, 293, 342-43). All of the medical opinions of record – including Koenig's, which was rejected by the ALJ – are consistent with the ALJ's conclusion that Davis was able to perform the standing and walking requirements of sedentary work. (Tr. 222-24, 231-34, 236-39, 311-14).

Indeed, other than his own statements concerning his inability to stand for prolonged periods, which were discounted by the ALJ (Tr. 24), Davis has failed to identify any record evidence that is inconsistent with the limitations assessed by the ALJ. Nothing else in the record suggests that Davis was unable to perform sedentary work with the limitations identified by the ALJ. I conclude that the ALJ's RFC assessment was based upon a thorough review of the record and was supported by substantial record evidence; accordingly, remand is not warranted. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("[n]one of the clinicians who examined [claimant] indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations[;] [a]lthough there was some conflicting

medical evidence, the ALJ's determination that [p]etitioner could perform her previous unskilled work was well supported").

## <u>CONCLUSION</u>

After careful review of the entire record, this Court finds that the Commissioner's denial of SSI/DIB is based on substantial evidence and is not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 13)** is **GRANTED**.  Davis's motion for judgment on the pleadings **(Docket # 11)** is **DENIED**, and Davis's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**


                                          *s/Marian W. Payson*
                                          MARIAN W. PAYSON
                                          United States Magistrate Judge

Dated: Rochester, New York
          February 27, 2017